UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL PUBLIC RADIO, INC., et al., *Plaintiffs*, v. FEDERAL BUREAU OF INVESTIGATION, et al., *Defendants*. | Civil Action No. 1:18-cv-03066 (CJN) |

## MEMORANDUM OPINION

In this suit under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, Plaintiffs National Public Radio (NPR) and Rebecca Hersher seek to compel the FBI to release a collection of videos depicting ballistics tests of certain types of ammunition. *See generally* Am. Compl., ECF No. 10. The FBI claims that the videos are subject to FOIA exemptions authorizing the withholding of law enforcement records that, if made public, might increase the risk of evasion of the law or harm to any individual. *See generally* Defs.' Mot. for Summ. J. ("Defs.' Mot."), ECF No. 23. Both Parties have moved for summary judgment. *Id.*; Pls.' Mot. for Summ. J., ECF No. 24. Because the Court concludes that the claimed exemptions do not apply, it awards summary judgment to NPR and grants it in part and denies it in part to the FBI.

### I.   Background

Over the years, NPR has "published a series of reports on the increasing lethality of, and injuries sustained from, common gun ammunition." Pls.' Resp. in Opp'n to Defs.' Mot. for Summ. J. ("Pls.' Opp'n") at 1, ECF No. 26. Hersher, an NPR journalist, filed a FOIA request with the FBI in 2018 seeking "video recordings of ballistics tests conducted with common

1

handgun and rifle ammunition, fired into ballistics gelatin, . . . including but not limited to: .9mm (sic) full metal jacket, .9mm (sic) expanding, .22 full metal jacket, and .223 full metal jacket." Pls.' FOIA Req. at 2, ECF No. 23-3 at 3.  The FBI denied the request in full without conducting a search for responsive records, stating that it would categorically withhold ballistics videos under FOIA Exemption 7(E).  *See* David M. Hardy's Ltr. of May 22, 2018, ECF No. 23-3 at 9.  The FBI denied NPR's administrative appeal on the same grounds.  *See* Sean R. O'Neill's Ltr. of Sep. 28, 2018, ECF No. 23-3 at 25–26.

NPR and Hersher filed this suit against the FBI and the Department of Justice.  *See generally* Compl., ECF No. 1; *see also* Am. Compl.  The FBI then agreed to conduct a search.  *See* David M. Hardy Decl. ("1st Hardy Decl.") ¶ 12, ECF No. 23-2.  The FBI determined that the records were likely to reside in either the Laboratory Division's Firearms/Toolmarks Unit or the Training Division's Defensive Systems Unit Ballistic Research Facility.  *Id.* ¶ 14.  The Firearms/Toolmarks Unit indicated that it does not maintain any video records, *id.*, and though it has assisted the Ballistics Research Facility with such tests, it deals only with internal firearm mechanics and does not research ballistics matters once the bullet leaves the gun, David. M. Hardy Decl. ("2d Hardy Decl.") ¶¶ 8–9, ECF No. 31-1.

The FBI therefore confined its search to the Ballistics Research Facility.  A Supervisory Special Agent searched the Facility's shared network drives and a standalone desktop computer for all video file types.  *Id.* ¶ 10.  He then watched each resulting video to determine which ones contained recordings of ballistics gelatin tests and then further screened the results for the ammunition types NPR sought.  *Id.*  That process located 97 responsive videos: "76 videos showing testing of .223 Remington / 5.56 mm NATO ammunition . . . and 21 videos with 9 mm Luger ammunition . . . ." David M. Hardy's Ltr. of Jun. 10, 2019, ECF No. 23-3 at 28.  After

reviewing the records, the FBI again decided to withhold them completely under FOIA Exemptions 7(E) and 7(F).  *See id*.

Both Parties subsequently moved for summary judgment.  *See generally* Pls.' Mot. for Summ. J.; Defs.' Mot.  The Cross-Motions focus on two disputes:  whether the FBI adequately searched its records for potentially responsive video recordings and whether the records are properly within the scope of either exemption.  *Id.*

## II.     Legal Standard

"[T]he vast majority of FOIA cases can be resolved on summary judgment."  *Brayton v. Office of U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).  "FOIA . . . mandates that an agency disclose records on request, unless they fall within one of nine exemptions."  *Milner v. Dep't of the Navy*, 562 U.S. 562, 565 (2011).  "FOIA mandates a 'strong presumption in favor of disclosure,'" *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991))—so much so that FOIA "expressly places the burden 'on the agency to sustain its action' and directs the district courts 'to determine the matter *de novo*,'" *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 756 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)).  FOIA permits the Court to review the records *in camera* "to determine whether such records or any part thereof shall be withheld under any of the exemptions."  5 U.S.C. § 552(a)(4)(B).

## III.     Analysis

### A.     The Search's Adequacy

Although NPR does not raise the issue, the FBI preemptively argues that its search for responsive records was adequate.  *See* Defs.' Mot. at 4–6.  "An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents."  *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325

3

(D.C. Cir. 1999) (internal quotation omitted). "The agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Id.* at 326 (internal quotation and alterations omitted). "The agency cannot limit its search to only one or more places if there are additional sources that are likely to turn up the information requested." *Id.* (internal quotations omitted). "At the summary judgment stage, where the agency has the burden to show that it acted in accordance with the statute, the court may rely on a reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Id.* (internal quotations omitted). "However, if a review of the record raises substantial doubt, particularly in view of well defined requests and positive indications of overlooked materials, summary judgment is inappropriate." *Id.* (internal quotations omitted).

      The FBI filed a declaration by David M. Hardy, the section chief who oversees FOIA processing, explaining the search methodology. *See* 1st Hardy Decl. ¶ 14. That declaration explains the FBI's process for narrowing its search to the Firearms/Toolmarks Unit and the Ballistics Research Facility. *Id.* Hardy's declaration indicates that, because the Firearms/Toolmarks Unit responded that it participated in some firearms testing but did not maintain records, the FOIA staff focused solely on the Ballistics Research Facility's archives. *Id.* The declaration details how the Ballistics Research Facility "subsequently conducted an electronic search of its video collection for responsive videos[,]" "further narrowed the results to any videos related to ballistics testing in gelatin[,] and manually scoped those results down to videos per caliber type," resulting in 97 responsive records. *Id.* Finally, the declaration avers that the FOIA staff "also confirmed with [the Firearms/Toolmarks Unit] and [Ballistics Research

Facility] [that] there were no other locations where responsive FBI videos of this nature would likely be located." *Id.*

NPR lodged seven objections to Hardy's declaration. *See* Pls.' Opp'n at 9. NPR argues that the declaration does not identify (1) why other components were unlikely to have responsive records; (2) any search for records within the Firearms/Toolmarks Unit; (3) the search terms used; (4) whether uniform search terms were used across databases; (5) "the connectors or Boolean logic operators" used in the search; (6) the systems or software used; or (7) who conducted the search. *Id.*

Hardy clarified some of those issues in a second declaration, which the FBI attached to its Reply brief. *See generally* 2d Hardy Decl. Hardy's second declaration explains that the Firearms/Toolmarks Unit and the Ballistics Research Facility are the only two FBI units that conduct ballistics testing, so the FOIA staff reasonably determined that it was unnecessary to search in other locations. *Id.* ¶ 7. The second declaration also states that the Firearms/Toolmarks Unit does not maintain video records, so no search of its files was necessary. *Id.* ¶ 8. This declaration states that the FBI located all video files stored on the Ballistics Research Facility's systems and then manually watched each to determine whether it was responsive, so there was no need to employ specific search terms, connectors, or "Boolean logic operators." *Id.* ¶ 10. Finally, Hardy's second declaration explains how a Supervisory Special Agent assigned to the Ballistics Research Facility personally searched the Facility's shared network drives and a standalone desktop computer and manually watched each video to locate responsive records. *Id.*

Having answered each of NPR's specific objections, the FBI has sufficiently demonstrated that its search was "a good faith effort . . . using methods which can be reasonably

5

expected to produce the information requested," *Valencia-Lucena*, 180 F.3d at 325, and is entitled to summary judgment on that question.

### B. Exemptions 7(E) and 7(F)

That leaves the question of whether the FBI is required to produce the videos located by its search. FOIA authorizes agencies to withhold "records or information compiled for law enforcement purposes" if disclosure would risk any of several enumerated harms. 5 U.S.C. § 552(b)(7). To justify its withholdings here, the FBI invokes two separate prongs of that exemption by arguing that the release of the videos might increase the risk of evasion of law enforcement (Exemption 7(E)) or harm to any individual (Exemption 7(F)). *See* Defs.' Mot. at 6–11 (citing 5 U.S.C. §§ 552(b)(7)(E)–(F)). In turn, NPR contests the applicability of each provision, *see* Pls.' Mem. of Law in Supp. of Pls.' Mot. for Summ. J. ("Pls.' Mot.") at 6–16, ECF No. 24,[1] argues that the *Vaughn* Index was procedurally deficient, *id.* at 16–17, and contends that the FBI is required to justify the withholding of each recording (or segregable portions thereof) rather than argue a categorical justification for all 97 videos, *id*. NPR does not contest, however, that the recordings were "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7); Pls.' Opp'n at 3–7.

#### 1. Exemption 7(E)

Exemption 7(E) applies when law enforcement records "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). It "sets a relatively low bar for the

---

[1] Plaintiffs combined their Motion (1–2), supporting Memorandum of Law (3–24), and Statement of Material Facts (25–29) into a single PDF file, ECF No. 24. All citations to those documents are to Plaintiffs' own pagination.

6

agency to justify withholding." *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011). "[T]he exemption looks not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain risk of circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk." *Mayer Brown LLP v. IRS,* 562 F.3d 1190, 1193 (D.C. Cir. 2009). "Rather than requiring a highly specific burden of showing how the law will be circumvented, exemption 7(E) only requires that the [agency] demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Id.* at 1194 (internal quotation and alterations omitted). Moreover,

> [b]ecause the FBI specializes in law enforcement, its decision to invoke exemption 7 is entitled to deference. [The] court's deferential standard of review is not, however, vacuous. If the FBI relies on declarations to identify a law enforcement purpose underlying withheld documents, such declarations must establish a rational nexus between the investigation and one of the agency's law enforcement duties and a connection between an individual or incident and a possible security risk or violation of federal law. If the declarations fail to supply facts in sufficient detail to apply the . . . rational nexus test, then a court may not grant summary judgment for the agency.

*Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 32 (D.C. Cir. 1998) (internal quotations and citations omitted).

In *Blackwell*, for example, the FBI withheld documents containing "details about procedures used during the forensic examination of a computer by an FBI forensic examiner" and "methods of data collection, organization and presentation contained in [certain FBI] reports." 646 F.3d at 42 (internal quotation omitted). As to the computer examination techniques, the FBI asserted that "the release of specifics of these investigative techniques would risk circumvention of the law by individuals who seek to utilize computers in violation of laws" and would "expos[e] computer forensic vulnerabilities to criminals." *Id.* As to the data methods,

7

the FBI argued that "the manner in which the data is searched, organized and reported to the FBI is an internal technique, not known to the public," that the methods were created specifically for the FBI by a contractor, and that disclosure "could enable criminals to employ countermeasures to avoid detection, thus jeopardizing the FBI's investigatory missions." *Id.* The Court of Appeals accepted those assertions, found that they "logically explain[ed] how the [information] could help criminals circumvent the law," and upheld judgment for the FBI. *Id.*

Likewise in *Mayer Brown*, a law firm sought documents relating to the IRS's practice of settling certain types of tax-enforcement cases. 562 F.3d at 1191. The IRS turned over everything except a small set of records containing "settlement strategies and objectives, assessments of litigating hazards, [and] acceptable ranges of percentages for settlement." *Id.* at 1192. The Court of Appeals determined that the IRS properly withheld the documents because knowledge of the IRS's settlement tactics would help aspiring tax evaders to conduct cost-benefit analyses of potential violations. *Id.* at 1193.

> Although the settlement guidelines requested are not "how to" manuals for law-breakers, the exemption is broader than that. Exemption 7(E) clearly protects information that would *train* potential violators to evade the law or *instruct* them how to break the law. But it goes further. It exempts from disclosure information that could *increase the risks* that a law will be violated or that past violators will escape legal consequences. Though the information here does not necessarily provide a blueprint for tax shelter schemes, it could encourage decisions to violate the law or evade punishment.

*Id.* The Court emphasized the exemption's "broad language" compared to the text of other exemptions and rejected Mayer Brown's calls to interpret FOIA narrowly, as courts do in most other contexts. *Id.* at 1194. The Court affirmed summary judgment for the IRS. *Id.* at 1196.

Even though courts take a deferential position toward the government's assertions of risk, *Blackwell*, 646 F.3d at 42, the government "must nevertheless provide a 'relatively detailed

8

justification' . . . that permits the reviewing court to make a meaningful assessment of the [withholding] and to understand how disclosure would create a reasonably expected risk of circumvention of the law," *Am. Immigration Council v. U.S. Dep't of Homeland Sec.*, 950 F. Supp. 2d 221, 246 (D.D.C. 2013) (quoting *Strunk v. U.S. Dep't of State,* 845 F. Supp. 2d 38, 47 (D.D.C. 2012)).

> Generic portrayals of categories of documents and vaguely formulated descriptions will not suffice; accordingly, the government must provide sufficient facts and context to allow the reviewing court to "deduce something of the nature of the techniques in question." *Clemente v. FBI,* 741 F. Supp. 2d 64, 88 (D.D.C. 2010); *accord Davis v. FBI,* 770 F. Supp. 2d 93, 100 (D.D.C. 2011) (finding defendant's "generic description of the documents as 'prosecution memoranda . . . detailing evidence gathering efforts and prosecution strategies in [plaintiff's] criminal case'" insufficient to describe techniques and procedures involved); *Strunk,* 845 F. Supp. 2d at 46–47 (summary listing of categories of techniques and procedures, including "computer screen transaction codes[,] . . . examination and inspection procedures, internal reporting requirements, names of specific law enforcement databases, . . ." not enough to discharge evidentiary burden).

*Am. Immigration Council*, 950 F. Supp. 2d at 246–47.

To meet its burden here, the FBI argues that

> [t]he responsive videos are part of the important testing and research conducted by the FBI for law enforcement training and ammunition procurement.  The disclosure of these videos would inform criminals how the FBI investigates the use of different types of ammunition in the commission of real-world criminal acts; and also how the FBI determines which types of ammunition are most effective for specific law enforcement applications.  Revelation of this information would provide criminals with an understanding of which types of ammunition they should use to inhibit FBI efforts to investigate their criminal acts involving the use of firearms.  It would also allow them to predict the use of specific types of ammunition in particular law enforcement applications, and inform them how best they should prepare for an armed confrontation with law enforcement.  Furthermore, the FBI determined release of these videos would reveal the performance capabilities of specific types of ammunition and their ability to wound individuals.  Public release

9

> of this information would enable criminals to discern which types of ammunition they should use in commission of different crimes and how they could more effectively cause harm to other individuals.

1st Hardy Decl. ¶ 19.  NPR responds in two ways.  First, it contends that FOIA's legislative history created an "explicit carve-out" ensuring that Exemption 7(E) would not apply to data from ballistics tests.  Pls.' Mot. at 8–9.  Second, NPR argues that the Hardy Declarations fail to provide enough information to justify applying the exemption.  Pls.' Resp. to Defs.' Opp'n to Pls.' Mot. for Summ. J. ("Pls.' Reply") at 3–9, ECF No. 32.

      *a.*    *Legislative History*

In NPR's view, Exemption 7(E) cannot apply to ballistics tests results because Congress created "an explicit carve-out" for that category of records.  Pls.' Mot. at 8–9.  The Conference Report on the FOIA Amendments of 1974 contains the following explanatory language discussing changes to Exemption 7(E):

> The conferees wish to make clear that the scope of this exception against disclosure of "investigative techniques and procedures" should not be interpreted to include routine techniques and procedures already well known to the public, such as ballistics tests, fingerprinting, and other scientific tests or commonly known techniques.

S. Rep. No. 93-1200, at 12 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6285, 6291.  Some courts have relied on that language to compel the government to disclose ballistics tests results, though that has usually been in the context of releasing records used as evidence *in an individual criminal case* to the defendant (often in preparation for filing a *habeas* petition).  *See, e.g.*, Higgs *v. U.S. Park Police*, No. 2:16-cv-96, 2018 WL 3109600, at *16 (S.D. Ind. Jun. 25, 2018) (collecting cases), *rev'd in part on other grounds*, 933 F.3d 897 (7th Cir. 2019).

Beyond *Higgs*, NPR points to only a handful of cases from the past few decades mentioning this legislative history, and most of those are district court opinions from the Third

10

Circuit that merely quote the Conference Report's language as part of the generic legal standard for considering withholding under Exemption 7(E).  *See* Pls.' Reply at 4–5 (citing, *e.g.*, *Cozen O'Connor v. Dep't of Treasury*, 570 F. Supp. 2d 749, 785 (E.D. Pa. 2008) (quoting *Davin v. U.S. Dep't of Justice*, 60 F.3d 1043, 1064 (3d Cir. 1995) ("This exemption, however, may not be asserted to withhold 'routine techniques and procedures already well-known to the public, such as ballistic tests, fingerprinting, and other scientific tests commonly known.'" (quoting *Ferri v. Bell*, 645 F.2d 1213, 1224 (3d Cir. 1981))))).  Those decisions have nothing to do with ballistics tests and so are not on point, much less binding on this Court.

The Court suspects that the dearth of recent cases applying the Conference Report in this context stems from courts' newfound hesitance to give weight to legislative history.[2]  *Higgs'* reliance on *Crooker v. Bureau of Alcohol, Tobacco & Firearms* is instructive.  *See* 2018 WL 3109600 at *16 (citing 670 F.2d 1051, 1064 n.36 (D.C. Cir. 1981) (en banc)).  In *Crooker*, the *en banc* Court of Appeals had to decide whether FOIA's "Exemption 2 . . . permits a federal agency to withhold documents whose 'disclosure may risk circumvention of agency regulation.'"  670 F.2d at 1052–53 (quoting *Dep't of the Air Force v. Rose*, 425 U.S. 352, 369 (1976)).  The ATF withheld a copy of a training manual on surveillance techniques under Exemption 2, which prevents disclosure of documents that are "related solely to the internal personnel rules and practices of an agency."  *Id.* at 1056 (quoting 5 U.S.C. § 552(b)(2) (1976)).  Four years earlier the Court of Appeals had held, sitting *en banc*, that the term "internal personnel rules" refers only to "pay, pensions, vacations, hours of work, lunch hours, parking etc.," *Jordan v. U.S. Dep't*

---

[2] NPR argues in a footnote that, "[c]ontrary to the government's bald assertion discounting all legislative history, courts routinely look to the legislative history of various FOIA exemptions, not just Exemption 7(E), for insights into how to properly apply the intent and purpose of the statute."  Pls.' Reply at 5 n.3 (internal citation omitted).  It goes on to cite three decisions from 1982, 1978, and 1976 as examples, essentially making the FBI's point.  *See id.*

11

*of Justice*, 591 F.2d 753, 763 (D.C. Cir. 1978) (en banc), but in the intervening years, the Second and Ninth Circuits had adopted a more expansive interpretation, *Crooker*, 670 F.2d at 1056 (citing *Caplan v. Bureau of Alcohol, Tobacco & Firearms*, 587 F.2d 544, 546 (2d Cir. 1978); *Hardy v. Bureau of Alcohol, Tobacco & Firearms*, 631 F.2d 653, 655 (9th Cir. 1980)).

Revisiting the issue in *Crooker*, the D.C. Circuit concluded in a brief look at the text that the phrase "internal personnel rules" is ambiguous. *Id.* at 1056–57. The Court then turned to an expansive review of the legislative history, determining that Congress intended to include training and investigatory techniques and procedures within the scope of Exemption 2. *Id.* at 1057–66. After reviewing treatment by other circuits, the Court concluded that Exemption 2 encompassed internal training documents and upheld the ATF's withholding. *Id.* at 1075. *See also id.* at 1089–90 (Mikva, J., concurring) (criticizing dissent for advocating a text-based approach) (citing *Church of the Holy Trinity v. United States*, 143 U.S. 457, 472 (1892)).

Much has changed since then, including the Supreme Court's express abrogation of *Crooker* in 2011. *See Milner*, 562 U.S. at 573. Writing for an eight-member majority, Justice Kagan criticized the *Crooker* Court's interpretation as "suffer[ing] from a patent flaw: [i]t is disconnected from Exemption 2's text." *Id.* at 573. Justice Kagan went on to compare the House and Senate Reports, which say opposite things, and concluded that "[l]egislative history, for those who take it into account, is meant to clear up ambiguity, not create it." *Id.* at 574. "When presented, on the one hand, with clear statutory language and, on the other, with dueling committee reports, we must choose the language." *Id.*; *see also Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 523 (D.C. Cir. 2015) ("Our consideration of Exemption 7(F)'s scope begins and ends with its text." (citing *Milner*, 562 U.S. at 569)). "[C]ourts must

12

presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992).

Exemption 7(E)'s text creates no carve-out for ballistics tests, and the Court will not infer one based on legislative history. In any case, there is nothing in the Conference Report or the cases to suggest that even if ballistics tests were outside the exemption's scope, a comprehensive set of *all* FBI tests on a particular type of ammunition—conducted not just to submit as evidence in individual criminal trials but as part of a systematic research and development program— would be subject to such a carve-out. *See* Defs.' Opp'n to Pls.' Mot. for Summ. J. ("Defs.' Opp'n") at 3, ECF No. 27. In interpreting other FOIA exemptions, courts have recognized that the amalgamation of many records may create a rationale for withholding that does not exist when each record is considered individually. *See, e.g.*, *Ctr. for Investigative Reporting v. U.S. Immigration & Customs Enf't*, No. 1:18-cv-01964, 2019 WL 6498817, at *5 (D.D.C. Dec. 3, 2019) (permitting withholding of comprehensive database of detained immigrants' arrest information under FOIA's privacy exemption even though some data was available in a searchable online database) (citing *Tuffly v. U.S. Dep't of Homeland Sec.*, 870 F.3d 1086, 1092 & n.5 (9th Cir. 2017)); *see also Reporters Comm.*, 489 U.S. at 764 ("Plainly there is a vast difference between the public records that might be found after a diligent search of courthouse files, county archives, and local police stations throughout the country and a computerized summary located in a single clearinghouse of information."). The FBI argues that the release of all 97 videos might permit savvy watchers to intuit certain lessons about the ways in which the FBI tests ammunition, selects particular rounds for specific missions, or thinks about what sorts of rounds to purchase for its agents—lessons that one or two videos would not convey on their

own. Defs.' Opp'n at 2. The Conference Report is unhelpful in answering those questions, and the Court declines to consider it.

                b.        The Hardy Declarations

The relevant inquiry, therefore, is whether the Court can discern from the two Hardy Declarations a "relatively detailed justification" for withholding the videos, *Strunk*, 845 F. Supp. 2d at 47 (quoting *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977)), that identifies a "rational nexus between the withheld material and a legitimate law enforcement purpose," *Campbell*, 164 F.3d at 32. To justify withholding to safeguard an investigatory technique, the government must provide "1) a description of the technique or procedure at issue . . . , 2) a reasonably detailed explanation of the context in which the technique is used, 3) an exploration of why the technique or procedure is not generally known to the public, and 4) an assessment of the way(s) in which individuals could possibly circumvent the law if the information were disclosed." *Am. Immigration Council*, 950 F. Supp. 2d at 247.

NPR attacks the Hardy Declarations in several ways, but the Court need only discuss one to conclude that the videos do not qualify for withholding under Exemption 7(E). NPR contends that even if ballistics tests are not expressly carved out of the exemption's scope, they still involve a widely known forensic technique and therefore cannot pose a risk of informing bad actors of some new way of breaking the law. Pls.' Mot. at 7–8, 10–11. To be sure, some decisions state that Exemption 7(E) is meant to protect only "secret investigative techniques and procedures," *Jaffe v. CIA*, 573 F. Supp. 377, 387 (D.D.C. 1983), and "investigatory techniques that are not widely known to the general public," *Smith v. Bureau of Alcohol, Tobacco & Firearms*, 977 F. Supp. 496, 501 (D.D.C. 1997); *see also Myrick v. Johnson*, 199 F. Supp. 3d 120, 124 (D.D.C. 2016) (quoting *Jaffe*, 573 F. Supp. at 387); *Shapiro v. U.S. Dep't of Justice*, 153 F. Supp. 3d 253, 273 (D.D.C. 2016).

14

But courts have also recognized that the exemption permits withholding of "'confidential details' of even publicly known techniques" and "commonly known procedures if disclosure could reduce or nullify their effectiveness." *Elec. Frontier Found. v. Dep't of Justice*, 384 F. Supp. 3d 1, 13–14 (D.D.C. 2019) (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1112 (D.C. Cir. 2007)) (other quotations and citations omitted). The FBI argues that the videos depict not only examples of ballistics tests but also information about how the FBI conducts such tests, what types of ammunition it tests, and, most importantly, the tests' results. *See* Defs.' Reply Mem. in Supp. of Mot. for Summ. J. ("Defs.' Reply") at 2–3, ECF No. 31. The first Hardy Declaration claims that "[t]he disclosure of these videos would inform criminals how the FBI investigates the use of different types of ammunition in the commission of real-world criminal acts; and also how the FBI determines which types of ammunition are most effective for specific law enforcement applications." 1st Hardy Decl. ¶ 19. With more dramatic flair, the FBI argues that "videos depicting fired ammunitions penetrating gelatin meant to simulate living tissue provide valuable intelligence and information for shooters of all types—mass shooters, armed bank robbers, cop killers, and drive-by shooters—in choosing the most lethal and effective weapon(s) to carry out his (sic) criminal objectives." Defs.' Reply at 3.

The Hardy Declarations and the FBI's briefs are certainly full of conclusory statements about the risk of disclosure, but they provide the Court with little concrete information about how a nefarious actor might translate the information in the videos into actionable intelligence about FBI tactics, techniques, and procedures. It is certainly conceivable that a comprehensive set of testing results might provide potential criminals with an advantage, but as NPR argues and emphasized at oral argument, *these* types of run-of-the-mill ammunition—9 mm Luger and .223 Remington (5.56 mm NATO) rounds—have been in common use for decades and are widely

known and understood, *see id.* at 10–11.  NPR therefore contends that, to justify withholding under Exemption 7(E), the videos must contain something more than generally available information about those types of ammunition.  *Id.*

Pressed on this point at oral argument, the FBI conceded that the videos contain no commentary by which FBI officials registered their reactions to the tests or discussed any information the FBI learned from the tests.  In an abundance of caution, the Court therefore exercised its prerogative to view a sample of the videos *in camera* so as to understand the connection between the videos and the risks the Hardy Declarations claim would materialize if the FBI were forced to produce the videos to journalists.  5 U.S.C. § 552(a)(4)(B).

Having viewed the videos, the Court concludes that the FBI's assertion of risks is unfounded.  Each video lasts no more than a few seconds and depicts a bullet striking a gelatin block in slow motion.  The videos contain no commentary or proprietary analysis that might betray the FBI's thoughts about a particular type of ammunition.  They do not contain details about how the FBI conducts the tests or sets up its laboratories in some special manner known only to law enforcement.  They do not show the rounds striking various types of body armor, thereby disclosing information about what sort of armor the FBI may have procured to protect its agents.  It appears that the ammunition's manufacturer—or just about anyone with an interest in doing so—could replicate the tests and achieve the same results.[3]  The videos do not contain any

---

[3] This fact arguably works against NPR's argument that FOIA's "central purpose"—"'to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed'"—mandates disclosure in this instance.  Pls.' Mot. at 6 (quoting *NLRB v. Robins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978)).  The videos here tell NPR little about "what the[] government is up to," *Reporters Comm.*, 489 U.S. at 773, and NPR could likely pay to conduct the ballistics tests itself and thereby obtain most of the information it might learn from the videos.  Nevertheless, the FBI does not argue that the videos' *lack* of useful content somehow permits withholding, and FOIA requesters need not assert a need to know the requested information.  *See id.*

sensitive government information that might distinguish them from ballistics tests conducted in any other laboratory, and the Court is unable to discern any appreciable risk that the videos' "disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  The FBI may not withhold the records under Exemption 7(E).

    **2.**    **Exemption 7(F)**

Exemption 7(F) protects against disclosure that "could reasonably be expected to endanger the life or physical safety of any individual."  5 U.S.C. § 552(b)(7)(F).  "The exemption does not require that a particular kind of individual be at risk of harm; 'any individual' will do.  Disclosure need not *definitely* endanger life or physical safety; a reasonable expectation of danger suffices."  *Pub. Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mex.*, 740 F.3d 195, 205 (D.C. Cir. 2014).

The FBI asserts that law enforcement officers and victims of violent crime might reasonably be expected to be endangered by the disclosure of these videos because criminals will learn more about firearms and use that information to their advantage.  1st Hardy Decl. ¶ 19.  In turn, NPR argues that any harm is speculative and that the claimed class of individuals is so amorphous as to render the exemption's text meaningless.  Pls.' Mot. at 12–15.

The Court need not discuss the Parties' arguments about the class of individuals who might be at elevated risk of harm, however, because, as with Exemption 7(E) above, the FBI has not justified its assertions that the videos contain any information bad actors might use to harm *anyone*.  The FBI has therefore not demonstrated that the videos are subject to Exemption 7(F).  The Court also need not reach NPR's arguments about whether the videos are already in the public domain, *see* Pls.' Mot. at 15, or about the *Vaughn* Index's sufficiency, *see id*. at 5.

IV.     Conclusion

Although the FBI adequately searched its archives for responsive records, its affidavits contain only conclusory assertions of risk that are unsupported by the videos' content.  The Court therefore grants summary judgment to NPR, grants it in part and denies it in part to the FBI, and orders the FBI to produce the records.  An Order will be entered contemporaneously with this Memorandum Opinion.

DATE:  August 28, 2020

_____
CARL J. NICHOLS
United States District Judge